W. J. BENBOW AND WIFE v. MARY A. MOORE et al.

*Equitable Conversion, when it takes effect—Jure Mariti— Choses in Action—Reduction into Possession by Husband—Resulting Trust—Practice—Judgment Valid When Made after Expiration of Term on Case Agreed Submitted to Judge.*

1. Money directed by a will or other instrument to be employed in the purchase of land, and land directed to be sold and turned into money, are to be considered as that species of property into which they are directed to be converted, and the subsequent devolution and disposition thereof will be governed by the rules applicable to that species of property.

2. Where a testator provided in his will for the sale of his lands to a certain person at a price to be ascertained by a prescribed method and for the division of the proceeds among his nieces, there was an equitable conversion of the land at the testator's death, in 1860, and the share of a niece then married became a chose in action and vested in the husband at the time, *jure mariti*, although the proceeds were not actually received by him until after the adoption of the Constitution of 1868.

3. Where, in such case, the husband invested the proceeds of the chose in action, so reduced into his possession, in land without any special agreement to invest and hold for the benefit of the wife, there was no resulting trust in her favor.

4. The legacy, notwithstanding an adverse claim was unsuccessfully made by another to the land so ordered to be sold, was the qualified property of the husband and upon its reduction into possession the title to it related back to the date of the testator's death and not to the time of its actual reduction.

5. A will made in another State will be construed according to the common law as expounded by the decisions of this Court, in the absence of proof that a different law or construction prevails in such other State.

6. A trial Judge has authority, under the agreement of counsel, to determine a case after the adjournment of Court, although his riding of the district be finished before his decision is rendered.

SPECIAL PROCEEDING for the partition of land and assignment of dower, commenced before the Clerk of the Supe-

rior Court of GUILFORD County and transferred to the Court in term, and tried upon a case agreed at December Term, 1892, before *Connor, J.*

The cause being duly called for trial, the jury chosen and impaneled, and the pleadings read, it was suggested by counsel that, as the controversy was one presenting a question of law, it should be submitted to the Court upon a case agreed, which was assented to, and immediately a statement was prepared by the counsel for the parties and handed to the Judge, who folded it and indorsed on the back of the paper the style and title of the cause and the words "Facts Agreed" and handed it to the Clerk. The jury was thereupon discharged for the hearing or consideration of the case. The "statement" was as follows:

"1. John Cunningham, of Davidson county, Tennessee, died in October, 1860, leaving a last will and testament probated in the proper Court of said State, of which a duly certified copy is hereto attached:

"'I, John Cunningham, of the county of Davidson and State of Tennessee, do make this my last will and testament:

"'First, out of my moneys on hand or due me at the time of my death, it is my wish that my debts be paid. It is my wish and will that my Aunt Letsey Coots, with whom I live, shall have the use of my two negro men, Randal and Tom, and any stock on the place belonging to me that she may need to cultivate the place for her support, as long as she may live. It is my wish that one thousand dollars be loaned out by my executor for the use and benefit of my afflicted niece, Miss Roberts, of North Carolina; the interest, one hundred dollars, to be paid her guardian yearly for her support as long as she lives. It is my wish and will that my negroes be allowed to choose their master or mas-

ters (Tom and Randal, at the death of my aunt, or before if she does not choose to keep them) and that the person so selected by them shall pay to my estate a moderate price, to be fixed upon each by three disinterested neighbors. Mothers of children under eight years of age to choose for such children, so as they may be kept together. It is my wish and will that my land (about one hundred and fifty acres) on which I live, including all reversionary interest, shall be sold to John Overton, at a price reasonable and fair, to be agreed upon by any three persons who may be acceptable to him and my executor, he paying the price fixed in one and two years. It is my wish and will that my executor pay over to my only living brother, James C. Cunningham, of North Carolina, four thousand dollars out of the first moneys coming into his hands, from collections, sale of negroes and stocks, after setting aside one thousand dollars for the use of my niece before mentioned. And lastly, it is my wish and will that all of the balance of the proceeds of the sale of my lands, negroes, etc., be equally divided, after the death of my Aunt Letsey, between all my nephews and nieces then living, except the niece to whom I have given the use of one thousand dollars, should she be alive. I constitute and appoint my neighbor, William D. Shute, my executor, and request that he may not be required to give security therefor. Witness this October 8, 1860.'          JOHN CUNNINGHAM, [Seal].'

"2. That Letsey Coots died in the year 1863.

"3. That on the death of John Cunningham Letsey Coots, legatee and devisee for life, filed a bill in equity seeking to set aside the disposition of the property in the will, she claiming that he had no right to dispose of the property, and on this bill it was finally adjudged that the will was operative and disposed of the property, and there-

upon John Overton took the land, as provided in the will, in May, 1868, giving his notes in equal installments, due in one and two years, to the administrator with will annexed, for the aggregate sum of thirteen thousand dollars, or thereabouts, and the deed from the administrator to said Overton bears date May 18, 1869.

"That defendant Mary A. Moore, the wife of H. C. Moore, was one of the nieces of John Cunningham, and as such is a legatee or devisee under the will, and her share in the proceeds of the land was $1,957.22, which was sent to this State in checks payable to her and her husband upon the following dates and amounts, to-wit: September 16, 1870, $933.57; May 17, 1873, $125; July 8, 1873, $125; January 28, 1874, $285.71; June 6, 1874, $450; September 2, 1875, $38.

"That of the money received as above H. C. Moore, the husband of Mary A. Moore, paid $1,400 for the Mill tract in controversy on the 2d of November, 1870, and that deed therefor was executed to him in his own name, and he died in 1877.

"That H. C. Moore died in possession of this and his other lands, and at his death his wife, Mary A. Moore, continued to reside on the lands and has so resided ever since, receiving and using the entire rents and profits for herself and family.

"That H. C. Moore and Mary A. Moore were married in 1860, and before the death of John Cunningham, of Tennessee."

The statement was not signed by either of the counsel.

The Court being continuously engaged in the trial of causes until the adjournment, it was agreed by and between counsel that the "case agreed," together with the briefs of counsel, should be sent to the Judge at his home in Wilson, N. C., after the expiration of the term and be decided by

him and judgment rendered as of the December Term, 1892.

The Court adjourned on the 19th of December, and this being the last term of the fall riding of 1892, the Judge left the district and returned to his home in the town of Wilson, in the Third Judicial District.

On the 18th day of January, 1893, the plaintiffs' counsel forwarded the papers in the cause, including the original statement of "Facts Agreed," to the Judge at his home in Wilson, N. C.

The delay in sending the papers to the Judge was caused by the engagements of defendants' counsel.

The plaintiffs' counsel, by letter, notified defendants' counsel, who resided in the same town, that the papers would be sent to the Judge on the 18th of January. The Judge began the riding of the Sixth Judicial District on the 16th of January in the county of Greene. On the 19th of January the defendants' counsel wrote to the Judge stating that he felt greatly embarrassed about the case, as he had been apprised, immediately after agreeing to the submission of the case, of some newly discovered testimony of great materiality, and requested his Honor, under the circumstances, not to consider the case. His Honor in reply stated that he had no disposition to decide the case unless all the facts as they really existed should be before him, and suggested that he, the defendants' counsel, should ask the plaintiffs' counsel to release him from the agreement. His Honor also wrote to the plaintiffs' counsel in regard to the matter, but they declined to consent to reopen the case. After waiting some weeks for the counsel to adjust the matter, and they failing to do so, his Honor, believing it to be his duty to render judgment upon the case as submitted to him, signed judgment in favor of the plaintiffs, and the defendants appealed, assigning as error:

BENBOW *v.* MOORE.

"That the judgment signed by the Judge and placed in the office of the Clerk of the Superior Court of Guilford by plaintiffs' attorney on the 17th of March, 1893, is void and of no effect, because:

"1. The same was considered, determined and signed by the Judge three months, or nearly so, after the close of the term of the Court at which the cause stood for trial, the said term being December Term, 1892, which ended December 17, 1892, and the judgment having been placed in the Clerk's office on the 17th of March, 1893.

"2. The facts upon which the judgment is based were not during the term at which the case stood for trial found by a jury, nor by the Court, nor are the same signed by the counsel for the parties as facts agreed.

"That the judgment was determined by Judge Connor after he had left the district in which the case is pending, and after the intervention of another regular term of the Superior Court of Guilford County, where the case is pending.

"4. That the action of the Judge in the case was had and the judgment rendered in the town of Wilson, in the Third Judicial District, and outside of the Fifth District.

"That at the time of the consideration of the case and the rendition of the judgment by Judge Connor he was not the Judge of the Fifth Judicial District, nor was he, by law, authorized to exercise the functions of Judge of the Superior Court therein.

"6. That even with the consent of parties the law does not authorize a Judge out of term time, and after he has ceased to be the Judge of the district, to perform judicial or official acts to the extent of rendering final judgment on the merits in causes pending on the trial dockets in such districts, and any judgment concluded and rendered by a Judge under such circumstances is *non coram judice* and void.

"Defendants assign further for error that if the judgment filed is regular and of binding effect the same is erroneous, and is not warranted by the facts upon which the same was rendered, and that there is error in the conclusions of law made by the Judge on the facts presented ; that the Judge should have held, on the facts presented, that the purchase-money of the land was at the time the separate property of the defendant Mary A. Moore, and not that of her husband, and that she is entitled to the land, and should have declared a resulting trust in her favor, The defendants except to the conclusions of law by the Judge and to the judgment itself."

*Messrs. Dillard & King*, for plaintiffs.
*Mr. J. E. Boyd*, for defendants (appellants).

SHEPHERD, C. J.: The defendant Mary A. Moore alleges that the mill tract mentioned in the pleadings was purchased by her husband, H. C. Moore, with money belonging to her separate estate, and she prays the Court to declare a trust in her favor against the heirs at law of the said H. C. Moore, to whom the legal title descended. The money used in the purchase of the land was the share to which the said Mary was entitled in the proceeds of certain lands in Tennessee which were sold under the provisions of the will of her uncle, John Cunningham, and was received by her husband subsequently to the adoption of the present Constitution. The question presented is whether this money was the property of the husband *jure mariti ;* and as the marriage was contracted in 1860, and before the death of the testator in the same year, it is necessary to determine whether under the will there was an equitable conversion of the said lands into personalty. It is a familiar maxim in equity "that things shall be considered as actually done which ought to have been done," and it is

with reference to this principle that land is, under some circumstances, regarded as money and money as land.   It was at an early period laid down by Sir Thomas Sewell, M. R., in the leading case of *Fletcher* v. *Ashburner*, 1 Bro. C. C., 497, "that money directed to be employed in the purchase of land and land directed to be sold and turned into money are to be considered as that species of property into which they are directed to be converted; and this in whatever manner the direction is given, whether by will, by way of contract, marriage articles, settlement, or otherwise, and whether the money is actually deposited or only covenanted to be paid, whether the land is actually conveyed or only agreed to be conveyed.   The owner of the fund or the contracting parties may make land money, or money land."

This principle is so universally accepted that it is needless to cite additional authority in its support and it is equally well settled "that every person claiming property under an instrument directing its conversion must take it in the character which that instrument has impressed upon it, and its subsequent devolution and disposition will be governed by the rules applicable to that species of property." 1 Williams on Exrs., 551; *Smith* v. *McCrary*, 3 Ired. Eq., 204; *Brothers* v. *Cartright*, 2 Jones' Eq., 113; *Conly* v. *Kincaid*, 1 Winston Eq., 44; *Proctor* v. *Ferebee*, 1 Ired. Eq., 143; Adams' Eq., 136.

It is undoubtedly true, as contended by counsel, that this constructive conversion cannot take place unless there is imposed upon the executor or other trustee an imperative duty to sell, arising either by express command or necessary implication.   These conditions, however, are fully met in the present case, as the will expressly directs that the land shall be sold, and the provision that it shall be sold to a certain person (John Overton) at a price to

be ascertained in the manner prescribed does not affect the operation of the principle when the price has been actually ascertained and paid and a conveyance duly executed. If the imperative duty of selling had not been imposed, and it had been left entirely to the discretion of the executor, there would have been no conversion until the contemplated purchaser had exercised his option and a contract of sale actually made. If, however, there is a *binding* contract to convey upon the option of the vendee, and the vendee exercises the option, the conversion will relate back to the time of the execution of the contract. "Thus" (says Mr. Pomeroy, 3 Eq. Jur., 1163) "where a lessee with an option to purchase, or any other purchaser with an option, duly declares his option after the death of the lessor or vendor, who is the owner in fee, the realty is thereby converted retrospectively as between those claiming under the lessor or vendor, or under his will—that is, as between the heir or devisee on one side and the legatees or next of kin on the other, the proceeds will go to his personal representatives, though the heir or devisee will be entitled to the rents up to the time when the option is declared." Bispham Eq., 321; 1 Beach Eq. Jur., 524; Adams' Eq., 141. This principle is equally applicable where the duty to sell is imposed by will. Indeed, it has been well remarked that "The question of conversion is one of intention, and the question is, Did the testator intend to have his real estate converted into personalty immediately upon his death? If he did a court of equity must give such intent effect, and treat the realty as personal property from that time." *Clift* v. *Maser*, 116 N. Y., 144; Beach Eq. Jur., 522.

"It is presumed," (says Judge STORY, 2 Com., 791) "that the parties in directing money to be invested in land, or land to be turned into money, intend that the property shall assume the very character of the property into which

it is to be converted, whatever may be the manner in which that direction is given."

"The doctrine," says Mr. Bispham, "is to be applied to all those cases in which a general intention of the testator is sufficiently manifested to give the property to the donee in a condition different from that in which it exists at the time when the will goes into effect. * * * The question always is, Did the testator intend to give money or to give land, and has that intention been sufficiently expressed? Once arrived at the intention by proper rules of interpretation, and the property will then be considered as impressed with that character which the testator designed it should bear when it reached the hands of the beneficiary." Bispham Prin. Eq., 312.

We have referred to the foregoing authorities because some stress seems to be placed by counsel upon the method in which the sale was to be made, whereas the controlling idea is whether the testator intended to change the character of the property. If this be clear, then, if the purchaser comply with the terms of the sale provided in the will, it is the duty of the Courts to give full effect to his intention by declaring a conversion at the date of his death. Looking, then, beyond the express direction to sell, and considering the general purpose of the will as indicated by its context, it is clear that the testator intended a conversion of all his real property. There is nothing to indicate that he intended to die intestate as to any portion of his property and especially of his realty, as he makes no disposition of it in that character, but provides that the proceeds of its sale, together with that of the personalty, shall be divided among certain of his nieces and nephews. The authorities are united to the effect that where there is an express or implied direction to convert the property the manner of the sale is immaterial. Here there is no con-

tingency upon which the power is to be exercised. The direction to sell is positive and unequivocal and the method in which the price is to be ascertained is a mere incident to the exercise of the power and nothing more. If, as we have seen, the principle of equitable conversion applies, there is no question but that the sale when made relates to the death of the testator. Pom. Eq. Jur., 1162; Bispham Eq., 320; *Conly* v. *Kincaid, supra; Smith* v. *McCrary, supra; Proctor* v. *Ferebee, supra.* The land, then, having been converted at the date of the death of the testator, the share of the said money was a chose in action (*Matthews* v. *Copeland,* 79 N. C., 493), and under the cases just cited vested in the husband at that time provided he reduced it into possession during the coverture. This right to reduce it into possession was a vested right and the husband could not be deprived of it by a subsequent change in the law. *O'Connor* v. *Harris,* 81 N. C., 279; *Morris* v. *Morris,* 94 N. C., 613. The husband having actually reduced the chose in action into possession and invested it in the land without any special agreement to invest and hold for the benefit of the wife (*Kirkpatrick* v. *Holmes,* 108 N. C., 206), we concur in the conclusion of the learned Judge below that there is no resulting trust.

The contention that the legacy did not vest in the husband because of the adverse claim of Letsey Coots to the property mentioned in the will (which was finally decided against her) is wholly untenable. The authority cited (*Caffy* v. *Kelly,* Busb. Eq., 48) applies to cases where, upon the marriage, chattel property of the wife is in the adverse possession of another. In such a case the wife has but a mere chose in action, which does not vest absolutely in the husband upon the marriage. 1 Bish. on Married Women, 71. This chose in action, however, like any other, becomes the qualified property of the husband upon the marriage,

18

and if, as in the present case, it is reduced into possession during the coverture the title to it relates to the marriage and not to the time of its actual reduction into possession. *O'Connor* v. *Harris, supra.*

The objection to the authority of the Judge to determine the case under the agreement of counsel after the adjournment of the Court, is also without merit. *Harrell* v. *Peebles,* 79 N. C., 26; *Shackleford* v. *Miller,* 91 N. C., 181. And we do not see how, under the circumstances, his Honor could have refused to proceed to judgment unless a motion had been distinctly made (which was not done) for a reopening of the case upon the ground of newly discovered testimony. This, however, would have been purely a matter of discretion and not reviewable by this Court, unless the Court had explicitly declined to entertain such motion on the ground of a want of power. *Brown* v. *Mitchell,* 102 N. C., 347.

In conclusion, we will observe that we have construed the will and the rights of the husband thereunder according to the principles of the English common law and equity, as expounded by the decisions of this Court and other authorities whose views are adopted by us. These, in the absence of proof that a different law or construction of the law prevails in Tennessee, must govern this case. *Worrell* v. *Vinson,* 5 Jones, 91; *Cade* v. *Davis,* 96 N. C., 139. The judgment is                                   Affirmed.